# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street NW
Washington, D.C. 20037

           PLAINTIFF

  V.

REBECCA BLANK, in her official capacity as
Acting Secretary of Commerce,
1401 Constitution Ave. N.W.
Washington, D.C. 20230;

ERIC C. SCHWAAB, in his official capacity as
Assistant Administrator for the
National Marine Fisheries Service
1315 East West Highway
Silver Spring, MD 20910; and

NATIONAL MARINE FISHERIES SERVICE
1315 East West Highway
Silver Spring, MD 20910;

           DEFENDANTS

CASE NO.

Complaint for Declaratory and
Injunctive Relief

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1. This is an action under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*., challenging Defendants' failure to comply with Section 4 of the ESA with respect to Plaintiff's January 21, 2010 petition to list the Northwest Atlantic Distinct Population Segment (DPS) of Porbeagle sharks (*Lamna nasus*) as threatened or endangered. On July 12, 2010, Defendants issued a 90-day finding concluding that, despite well-documented scientific information demonstrating a drastic reduction in the Northwest Atlantic Porbeagle shark population and the multiple threats to its continued existence, the petition did not

"present[] substantial scientific information indicating the petitioned action[] may be warranted." In issuing that finding, Defendants violated the ESA and the APA.

## JURISDICTION

2. The Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(g) (the ESA citizen suit provision), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as a defendant), and 5 U.S.C. §§ 701-706 (APA).

3. As required by the ESA, Plaintiff provided the Secretary with written notice of intent to sue, on October 8, 2010, more than 60 days ago. 16 U.S.C. § 1540(g)(2). The Secretary has not remedied the violations of law; thus, there exists an actual controversy between the parties within the meaning of the Declaratory Judgment Act. 28 U.S.C. § 2201.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g).

## PARTIES

5. Plaintiff THE HUMANE SOCIETY OF THE UNITED STATES ("HSUS") is a non-profit animal protection organization, headquartered in Washington, D.C., with over eleven million members and constituents nationwide. Since its establishment in 1954, The HSUS has worked to combat animal abuse and exploitation and promote animal welfare. To this end, The HSUS actively strives to improve the management of marine and estuarine resources throughout the Atlantic coastal states, the common range of the Northwest Atlantic DPS of Porbeagle sharks. Further, The HSUS has specifically worked to promote the conservation of Porbeagle sharks by advocating to reduce or eliminate

overfishing of vulnerable shark species and stocks, and to end inhumane and exploitative recreational shark fishing tournaments, in which Porbeagle sharks are a common target.

6. On January 21, 2010, The HSUS, on behalf of itself and its members, submitted to the National Marine Fisheries Service ("NMFS") a petition to list the Northwest Atlantic population segment of Porbeagle sharks under the ESA. The HSUS intended to, and if successful in this litigation will, participate in the 12-month status review that would follow a positive 90-day finding on the ESA listing petition.

7. In continuing its efforts to protect Porbeagle sharks, on February 16, 2010, The HSUS submitted a separate petition to list Porbeagle sharks as a "prohibited species" under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801, *et seq*., to prohibit the retention of any Porbeagle shark caught in United States waters.

8. The HSUS' members and staff rely on Porbeagle sharks for recreational, aesthetic, professional, and economic purposes. The HSUS' members regularly visit coastal areas and otherwise enjoy the ocean and its inhabitants. Our members enjoy seeing animals alive in the wild, are distressed when they view dead sharks that they believe have been unnecessarily killed for commercial or recreational purposes, and are concerned about the decline in shark numbers and their risk of extinction. The HSUS' members who regularly recreate in areas where Porbeagle sharks can be seen, and who desire to see these sharks, will not be able to do so if the species is not properly protected from threats to its survival as required by law. Further, HSUS members and staff who spend time and other resources researching and advocating for protection of sharks are adversely affected by the Secretary's failure to comply with the ESA and APA.

9.  Defendant REBECCA BLANK is sued in her official capacity as the Acting Secretary of
    Commerce. The Secretary is the federal official who bears ultimate responsibility for
    implementation of the ESA, including making listing determinations for species. The
    Secretary has delegated the charge of reviewing listing petitions under the ESA to the
    National Marine Fisheries Service, a division of the National Oceanic and Atmospheric
    Administration (NOAA).

10. Defendant ERIC C. SCHWAAB is sued in his official capacity as Assistant Administrator
    for NOAA Fisheries. The Assistant Administrator manages the National Marine Fisheries
    Service (NMFS) and is responsible for implementing the ESA, including review and
    approval of petitions proposing to list species as threatened or endangered.

11. Defendant National Marine Fisheries Service is an agency within NOAA of the
    Department of Commerce.  NMFS is the federal agency that issued the denial of HSUS'
    petition to list the Northwest Atlantic population of Porbeagle sharks under the ESA.

STATUTORY FRAMEWORK

*The Endangered Species Act*

12. The ESA is a federal statute enacted to conserve endangered and threatened species and
    the ecosystems upon which those species depend. 16 U.S.C. § 1531(b).

13. Under the ESA, a species is "endangered" if it is "in danger of extinction throughout all
    or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it
    is "likely to become an endangered species within the foreseeable future throughout all or
    a significant portion of its range." 16 U.S.C. § 1532(20).

14. To achieve the conservation-focused purposes of the ESA, NMFS is required to protect

imperiled species by listing them as either "threatened" or "endangered" if they are

facing extinction due to any one, or any combination of, the following factors:

> (A) the present or threatened destruction, modification, or curtailment of its
>
> habitat or range;
>
> (B) overutilization for commercial, recreational, scientific, or educational
>
> purposes;
>
> (C) disease or predation;
>
> (D) the inadequacy of existing regulatory mechanisms; or
>
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).

15. Under the ESA, the term "species" is explicitly defined to include "any subspecies of fish

or wildlife or plants, and any *distinct population segment* of any species of vertebrate fish

or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16) (emphasis added).

Thus, if a distinct population segment of any species satisfies one or more of the listing

factors, it must be listed as threatened or endangered.

16. The ESA does not define "distinct population segment" but NMFS and the Fish and

Wildlife Service have adopted a Joint Policy Regarding the Recognition of Distinct

Vertebrate Population Segments ("DPS Policy"). Pursuant to this DPS Policy, NMFS

must evaluate the "discreteness of the population segment in relation to the remainder of

the species or subspecies to which it belongs," and "the significance of the population

segment of the species or subspecies to which it belongs." 61 Fed. Reg. 4722, 4725 (Feb.

7, 1996).

17. A population segment may be considered discrete if it satisfies either one of the following

conditions: First, "[i]t is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors." While "evidence of genetic distinctness . . . may be important in recognizing some DPS's" the "policy was not intended to always specifically require this kind of evidence in order for a DPS to be recognized." Secondly, a population segment may be considered discrete if "[i]t is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of" the ESA listing factor regarding the inadequacy of existing regulatory mechanisms. 61 Fed. Reg. at 4723-25.

18.  NMFS must also consider a population's "biological and ecological significance" to the taxon to which it belongs, including, but not limited to, (1) "[p]ersistence of the [DPS] in an ecological setting unusual or unique for the taxon;" (2) "[e]vidence that loss of the [DPS] would result in a significant gap in the range of a taxon;" (3) "[e]vidence that the [DPS] represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range," or (4) "[e]vidence that the [DPS] differs markedly from other populations of the species in its genetic characteristics." *Id.* at 4725. These factors are nonexclusive – if any one factor is satisfied, a discrete population is considered significant.

19. Further, evaluation of whether the DPS is endangered or threatened must be based on the standards set forth in Section 4 of the ESA, including the five listing factors. *See id.*; 16 U.S.C. § 1533(a).

20. An imperiled species, or DPS, only receives protection under the ESA if it is formally listed as threatened or endangered. *See* 16 U.S.C. § 1538; 50 C.F.R. §§ 17.21, 17.31.

Thus, the listing process is an essential first step towards species protection and recovery. Any interested person can file a petition to list a species, or DPS, with the Secretary. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a).

21. When a petition to list a species is filed, the Secretary must make a finding within 90 days, to the maximum extent practicable, "as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). "Substantial information" is the "amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b).

22. In making the 90-day finding, NMFS must consider whether the petition:

(a) Clearly indicates the administrative measure recommended and gives the scientific and common name of the species involved;

(b) Contains detailed narrative justification for the recommended measure, describing, based upon available information, past and present numbers and distribution of the species involved and any threats faced by the species;

(c) Provides information on the status of the species over all or a significant portion of its range; and

(d) Is accompanied by appropriate supporting documentation in the form of bibliographic references, reprints of pertinent publications, copies of reports or letters from authorities, and maps.

40 C.F.R. § 424.14(b)(2).

23. A 90-day finding is preliminary in nature, and is not itself a review of the status of the species under the ESA. At this stage, the Secretary is required to accept the petitioner's

sources and characterizations of the information, unless the Secretary possesses specific information to the contrary, in determining whether listing "may be warranted." 50 C.F.R § 424.14(b).

24. If the Secretary concludes in its 90-day finding that the petition does not present substantial information indicating listing may be warranted, the listing process concludes. The ESA expressly provides that a negative 90-day finding may be challenged in federal court. 16 U.S.C. § 1533(b)(3)(C)(ii).

25. If the Secretary makes a positive 90-day finding, he must promptly publish it in the Federal Register and commence a "status review" of the species. 16 U.S.C. § 1533(b)(3)(A). A status review enables the agency to do a more thorough analysis of the status of a species, including the opportunity to collect input the scientific community, assess scientific uncertainty, and determine whether a population qualifies as a DPS and whether it is threatened or endangered.

26. After issuing a positive 90-day finding, the Secretary has 12 months from the date that he received the petition to make one of three findings: (1) the petitioned action is not warranted; (2) the petitioned action is warranted; or (3) the petitioned action is warranted but presently precluded by work on other pending proposals for listing species and expeditious process is being made to list qualified species. 16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14(b)(3).

27. If the Secretary finds that listing the species is warranted, he must publish a proposed rule to list the species as endangered or threatened in the Federal Register.16 U.S.C. § 1533(b)(5).

28. Within one year of the publication of a proposed rule to list a species, the Secretary must

make a final decision on the proposal. 16 U.S.C. § 1533(b)(6)(A).

*The Administrative Procedure Act*

29. The APA governs the manner in which an administrative agency makes formal decisions, including decisions on petitions for the establishment of rules and regulations by the agency. 5 U.S.C. §§ 551, *et seq*. The APA also sets forth a means by which federal courts may directly review agency decisions. *Id*. at § 702.

30. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The failure of an agency to carry out a statutorily mandated duty is thus a violation of the APA. The APA also requires that agency decisions be set aside if the agency has failed to "observ[e] procedures required by law." 5 U.S.C. § 706(2)(D).

## FACTS GIVING RISE TO PLAINTIFF'S CAUSE OF ACTION

*Porbeagle Sharks*

31. Porbeagle sharks inhabit cool and temperate waters, and are an apex predator that feeds on fish, squid, and some small sharks. Porbeagles are long-lived and slow-maturing – females take thirteen years to reach sexual maturity and can live up to forty-five years. Females spawn every one to two years, giving live birth to an average litter of four pups. Porbeagle sharks are particularly vulnerable to threats to their survival due to their late onset of sexual maturity and low lifetime fecundity.

32. The Northwest Atlantic population of Porbeagle sharks is found off the coast of Greenland, Canada, and the United States, including Maine, Massachusetts, Rhode Island, New York, Connecticut, New Hampshire, and New Jersey. Several studies have

shown that there is no significant interchange with other populations. There is no evidence of mixing between the Northwest Atlantic population and Porbeagles in the southern hemisphere and only one recorded example of exchange between the Northwest Atlantic population and Northeast Atlantic population.

33.  The Northwest Atlantic population of Porbeagles has suffered a loss of up to 90% of its virgin biomass. There have been two major declines in this population. The first began in the 1960s with the onset of large-scale commercial fisheries, and the population collapsed within six years. After a period of low catches and modest recovery, the Northwest Atlantic population collapsed again in the 1990s, when fishing efforts increased. Recent stock assessments have estimated the total population size for Northwest Atlantic Porbeagles at 188,000-191,000 sharks, and studies suggest that the population over the last decade may have increased slightly, remained stable, or even further declined.

34. Despite the uncertainty over current Northwest Atlantic Porbeagle current population trends (various models show the total population in 2009 at 95% to 103% of its 2001 level and the population of mature females in 2009 at 83% to 103% of its 2001 level), there is no doubt that the historic decline has been dramatic, and that Porbeagle sharks continue to face numerous threats to their survival.

35. Coastal pollution from the industrialized northeastern United States can bioaccumulate and have magnified impact in apex predators like Porbeagle sharks. Warming ocean waters and ocean acidification caused by global climate change pose an additional threat to the health of Northwest Atlantic Porbeagles and the ecosystems that sustain them.

36. Overfishing for commercial and recreational purposes severely threatens this slow-reproducing species. Porbeagle sharks are landed by domestic and international

commercial fisheries, primarily by pelagic longline methods. Landings are often under-reported, especially on the high seas, and consist primarily of juveniles. Porbeagles are also exploited for recreational purposes – some tournaments in the North Atlantic region of the United States offer prizes for the largest Porbeagle sharks caught. When these sharks are landed, a Porbeagle often will be dragged behind fishing boats to drown the shark.

37. Existing domestic, foreign, and international regulatory mechanisms are inadequate to prevent continued depletion of Porbeagle sharks. NMFS does not track all mortalities from recreational and commercial fisheries in the United States. The total catch legally allowed by the United States and Canada is well above the limit that NMFS acknowledges as sustainable. Catch on the high seas, which is believed to be greater than the total catch by the United States and Canada combined, is largely unregulated, and there are currently no controls or monitoring systems in place to measure international trade in the species.

38. That Porbeagle sharks in the Northwest Atlantic are in need of significant protection at this time cannot be disputed. The International Union for the Conservation of Nature ("IUCN") lists Porbeagle sharks as vulnerable across its range, and lists the Northwest Atlantic population as endangered. The IUCN also lists Porbeagle shark populations as decreasing, both overall and specifically in the Northwest Atlantic.  Further, the United States has advocated at the international level for increased protections for the species – for example in March 2010, the U.S. supported a petition to list Porbeagle sharks on Appendix II of the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES").

*Petition to List Porbeagle Shark DPS*

39. On January 21, 2010, HSUS submitted a petition to NMFS to list the Northwest Atlantic DPS of Porbeagle sharks (*Lamna nasus*) as threatened or endangered under the ESA. Specifically, the petition presented substantial information that several of the ESA listing factors are triggered, including habitat degradation, overutilization for commercial and recreational purposes, inadequacy of existing regulatory mechanisms, and other factors such as low fecundity of species.

40. On July 12, 2010, NMFS issued a 90-day finding on HSUS' Porbeagle listing petition. NMFS concluded that the petition did not present substantial scientific information indicating that the petitioned action may be warranted, finding that there was not enough information *to conclude* that the Northwest Atlantic population is a DPS, and that even if there was a DPS, such population is not threatened or endangered. 75 Fed. Reg. 39,656, 39,658-62 (July 12, 2010).

41. In making its finding not to recognize a Northwest Atlantic Porbeagle DPS, NMFS concluded that "[g]iven the conflicting evidence from the tagging and genetic data, without a more thorough analysis it is unclear as to whether porbeagle shark DPSs exist." *Id.* at 39,658.   Notably, NMFS did not resolve this supposed conflict in reaching its decision. The agency chose to issue a negative 90-day finding for this population *because*, according to the agency, conflicting evidence exists.

42. In analyzing the impact of threats to the species, NMFS claims that it "heavily relied" on information from the Report of the 2009 Porbeagle Stock Assessments Meeting between the International Council for the Exploration of the Sea ("ICES") and the International Commission for the Conservation of Atlantic Tunas ("ICCAT"). *Id.* After quoting the

results of that report as estimating the numbers of mature female Porbeagles at "83 to 103 percent of its 2001 value," NMFS falsely asserted that the ICES/ICCAT report concluded that current "biomass appears to be increasing." *Id.* at 39,659.  In fact, the ICES/ICCAT Report indicates that Porbeagle shark abundance may be decreasing.

43. With regard to habitat degradation, NMFS found that "no information is presented to indicate that porbeagle sharks . . . are currently at greater risk of being impacted by coastal pollution than other sympatric shark species." *Id.* Thus, NMFS based its decision not to proceed to a status review for Porbeagle sharks, at least in part, on a conclusion that the level of modification or destruction of the species' habitat is not any worse than it is for other oceanic species.

44. In analyzing the overutilization factor, NMFS concluded that "[a]lthough the petitioners claim that overutilization of porbeagle sharks for commercial and recreational purposes . . . requires that the species be listed under the ESA, available information indicates that porbeagle shark population trends are stable or increasing globally, and that protections for the species are increasing in these areas as well; therefore, the petition[] do[es] not present substantial information indicating that the petitioned action[] . . . may be warranted at this time." *Id.* at 39,661.  NMFS has previously recognized that Porbeagle sharks have suffered from overfishing and need additional protections, yet did not reconcile those past findings in dismissing the overutilization factor, instead focusing on current abundance levels.

45. NMFS also found that "it is reasonable to conclude that the existing regulatory mechanisms are adequately protecting porbeagle sharks." *Id.* at 39,661. However, the

total catch allowed by the United States and Canada alone exceeds sustainable levels. Further, it is undisputed that catches on the high-seas are under-reported and unregulated. In denying the listing petition, NMFS also relied on the speculative conclusion that, in addition to existing regulatory mechanisms, "regulations that benefit porbeagles are increasing" on an international level. *Id*.

46. The HSUS sent the Secretary and NMFS a sixty-day notice of its intent to sue, satisfying statutory notice requirements, on October 8, 2010.

PLAINTIFF'S CLAIMS FOR RELIEF

*FIRST CLAIM FOR RELIEF*
*(Use of an Improper Standard for a 90-Day Finding)*

47. Each of the allegations set forth above are incorporated by reference herein.

48. Pursuant to Section 4(b) of the ESA, a 90-day finding provides a threshold review of an ESA listing petition. NMFS must determine that "the petition presents substantial scientific or commercial information indicating that [listing] may be warranted" to move on to a 12-month status review. 16 U.S.C. § 1533(b)(3). Substantial information is "information that would lead a reasonable person to believe that the measure proposed in the petition *may* be warranted." 50 C.F.R § 424.14(b) (emphasis added).

49. NMFS did not determine if HSUS' petition provided substantial scientific information that would lead a reasonable person to believe that the listing of the Northwest Atlantic Porbeagle DPS as a threatened or endangered species may be warranted. Instead, NMFS applied an erroneous legal standard, requiring that the petition provide conclusive evidence that the Northwest Atlantic population is a distinct population segment as well as conclusive evidence that the threats to the Porbeagle shark will lead to extinction.

50. The information presented in the petition, as well as data possessed by NMFS, is more than sufficient to lead a reasonable person to believe that the Northwest Atlantic population of Porbeagle sharks is both discrete and significant, and thus qualifies as a DPS; there is also substantial information in the record to lead a reasonable person to believe that the Northwest Atlantic Porbeagle DPS is in danger of extinction, and thus must be further evaluated for listing as either threatened or endangered.

51. For example, HSUS presented evidence indicating that the Northwest Atlantic population of Porbeagles is separated from other populations due to geographic and behavioral factors, yet NMFS concluded that "there is conflicting scientific evidence regarding whether DPSs or porbeagle sharks exist." The mere existence of scientific uncertainty does not warrant a negative 90-day finding and should have led the agency to initiate a status review to collect more information. However, NMFS instead rejected HSUS' petition on the basis that it did not provide conclusive evidence of the existence of a Northwest Atlantic DPS.

52. Similarly, NMFS also ignored the scientific uncertainty as to current population abundance and trends, erroneously concluding that the ICES/ICCAT Report concluded that the population is increasing. In fact, the ICES/ICCAT Report suggests that the population may be decreasing. NMFS then used this misguided presumption to dismiss the impact of threats from overutilization and inadequate regulatory mechanisms, asserting that since the population appears to be increasing, the evidence of threats to the population's survival is not conclusive enough to potentially warrant listing.

53. Further, NMFS concluded that "[g]iven the conflicting evidence from the tagging and genetic data, without a more thorough analysis it is unclear as to whether porbeagle shark

DPS's exist." However, NMFS cannot issue a negative 90-day finding simply because a more thorough analysis of the available data would be necessary to make the listing determination.  The ESA listing process is designed to address this precise situation, requiring a more thorough analysis in the form of a 12-month status review if listing the species "may be warranted." 16 U.S.C. § 1533(b)(3).

54. By applying too stringent a standard of review to The HSUS' petition, NMFS imposed a higher burden than that imposed by the ESA and thereby violated the ESA's 90-day finding requirement. 16 U.S.C. § 1533(b)(3). Taken as a whole, the information available to NMFS would lead a reasonable person to believe that listing a Northwest Atlantic Porbeagle DPS as threatened or endangered may be warranted. By applying an erroneous standard of review, NMFS' negative 90-day finding is also arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the ESA within the meaning of the APA. 5 U.S.C. § 706(2).

### SECOND CLAIM FOR RELIEF
*(Failure to Rely on the Best Scientific and Commercial Data Available)*

55. Each of the allegations set forth above are incorporated by reference herein.

56. Pursuant to Section 4(b) of the ESA, when making a listing determination pursuant to the ESA, NMFS must rely on the best scientific and commercial data available. 16 U.S.C. § 1533(b)(1)(A).

57. In addition to applying an erroneous standard of review to the HSUS' petition, NMFS also ignored and misrepresented important scientific and commercial data in order to reach a negative 90-day finding.

58. Although NMFS recognized the dramatic historic decline in Porbeagle shark populations, in which up to 90% of the biomass has been lost primarily due to overutilization, NMFS

ignored this data when applying the ESA listing factors and reaching its conclusion that listing is not warranted. Instead, NMFS erroneously focused exclusively on current abundance data to conclude that the species is not threatened by overutilization and inadequate regulatory mechanisms, in violation of the ESA's requirement that listing decisions must be based on the best scientific and commercial data available. 16 U.S.C. § 1533(b)(1)(A).

59. Further, in the negative 90-day finding on HSUS' petition to list Porbeagle sharks, NMFS misrepresented the findings of the ICES/ICCAT Report, which it claims to have relied on heavily in making its decision. By concluding that the ICES/ICCAT Report found that the Northwest Atlantic Porbeagle population is increasing, even though that study clearly concluded that the population may be decreasing, stable, or increasing, NMFS violated the ESA's requirement that the agency base its listing determinations on the best scientific and commercial data available. 16 U.S.C. § 1533(b)(1)(A).

60. NMFS also ignored or discounted substantial scientific information, including its own, in rejecting a finding that there is a Northwest Atlantic Porbeagle DPS.  This led to an erroneous finding that the threats to the species do not warrant listing the DPS as threatened or endangered. NMFS thus failed to use the best scientific information available in making its 90-day finding on HSUS' listing petition as required by the ESA. 16 U.S.C. § 1533(b)(1)(A).  , and thus its finding was and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the ESA within the meaning of the APA. 5 U.S.C. § 706(2).

61. By ignoring and misrepresenting the best available science relevant to the listing determination, the NMFS' 90-day finding is arbitrary, capricious, an abuse of discretion

and otherwise not in accordance with the ESA within the meaning of the APA. 5 U.S.C. §

706(2).

### THIRD CLAIM FOR RELIEF
#### (Improper DPS Analysis)

62. Each of the allegations set forth above are incorporated by reference herein.

63. Pursuant to NMFS' DPS Policy, in order to determine whether a particular population of

a species is a "distinct population segment" that should be listed under the ESA, NMFS

must consider the "discreteness" and the "significance" of the population segment in

relation to the remainder of the species. 61 Fed. Reg. 4722, 4725. "Discreteness" is based

on whether the population segment "is markedly separated from other populations of the

same taxon as a consequence of physical, physiological, ecological or behavioral

factors." *Id*. "Significance" is based on "biological and ecological" factors, including,

*inter alia*, "persistence of the [DPS] in an ecological setting unusual or unique for the

taxon," and "evidence that loss of the [DPS] would result in a significant gap in the range

of the taxon." *Id.*

64. The HSUS presented information from multiple studies concluding that there is no

exchange between the Northwest Atlantic population and Porbeagles in the southern

hemisphere, and only one recorded example of exchange between Northwest and

Northeast Atlantic populations of Porbeagle sharks, and that the Northwest Atlantic

Population is therefore discrete. Although evidence of genetic distinction is not required

for establishing a DPS pursuant to NMFS' DPS Policy, 61 Fed. Reg. 4722, 4723, NMFS

nevertheless relied exclusively on "mitochondrial DNA studies which were readily

available in our files [that] indicate that there is no differentiation among the stocks

within the North Atlantic." 75 Fed. Reg. at 39,658. NMFS then dismissed the studies

presented by The HSUS, noting simply that the petition presented "conflicting evidence" and "without a more thorough analysis it is unclear as to whether porbeagle shark DPSs exist." 75 Fed. Reg. at 39,658.

65. The HSUS also presented substantial information in support of a finding that the loss of the Northwest Atlantic population of Porbeagles "would result in a significant gap in the range of the taxon," pursuant to the "significance" factors in NMFS' DPS Policy. 61 Fed. Reg. at 4725. Yet NMFS apparently ignored this information, making no finding specific to whether loss of the Northwest Atlantic population would be significant.

66. NMFS' conclusion that there is no Northwest Atlantic Porbeagle shark DPS is not consistent with the information presented in The HSUS' listing petition, other information available to the agency at the time of its decision, or NMFS' DPS Policy. As such, this decision is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the ESA within the meaning of the APA. 5 U.S.C. § 706(2).

### FOURTH CLAIM FOR RELIEF
#### (Improper Application of the ESA Listing Factors)

67. Each of the allegations set forth above are incorporated by reference herein.

68. Pursuant to Section 4(a) of the ESA, NMFS is required to make listing decisions based on five factors: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1).

69. NMFS found that neither habitat degradation, nor overutilization for commercial or recreational purposes, nor inadequate regulatory mechanisms are significant threats to the

continued existence of the Northwest Atlantic Porbeagle DPS. In making that finding, NMFS erroneously relied on information regarding current species abundance; minimized threats to Porbeagle sharks by comparing them to threats to other sharks; ignored substantial evidence of overfishing; and justified its finding by looking at potential future international and foreign regulations. These actions are all inconsistent with the agency's mandatory duty to apply the five factor analysis set forth in Section 4 of the ESA. 16 U.S.C. § 1533(a)(1).

70. As a threshold matter, NMFS makes clear that in addition to the statutory listing factors, the agency "evaluate[d] whether the porbeagle shark or DPS[] proposed by the petitioner[] are at abundance levels that would lead a reasonable person to conclude that listing under the ESA may be warranted." 75 Fed. Reg. at 39,658. However, neither current species abundance nor current population trends are factors enumerated in the ESA for consideration during the listing process, and it is arbitrary and capricious within the meaning of the APA, 5 U.S.C. § 706(2), for NMFS to require that a species that has suffered a massive decline from historic populations must also be currently in decline in order to be considered threatened or endangered.

71. As to the first listing factor regarding the species' habitat, NMFS concluded that because "no information is presented to indicate that porbeagle sharks . . . are currently at greater risk of being impacted by coastal pollution than other sympatric shark species," threats from coastal pollution are not significant to the species' survival. 75 Fed. Reg. at 39,659. NMFS improperly discounted the evidence on habitat degradation presented in The HSUS' petition without pointing to any countervailing evidence specific to Porbeagle sharks. The ESA requires NMFS to evaluate whether an individual species or DPS is

threatened or endangered based on listing factors focused on threats to that species or DPS, and does not require petitioners to submit information pertaining to, nor permit NMFS to make a listing decision based upon, threats to other species. Therefore, NMFS' finding was and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the ESA within the meaning of the APA. 5 U.S.C. § 706(2).

72. In finding that overutilization is not a substantial threat to the Northwest Atlantic Porbeagle population, NMFS stated that "available information indicates that porbeagle shark population trends are stable or increasing globally, and that protections for the species are increasing in these areas as well; therefore, the petition[] do[es] not present substantial information indicating that listing the [DPS] . . . due to historical and current overutilization may be warranted at this time." 75 Fed. Reg. at 39,661. NMFS fails to explain why information relative to current abundance levels and developing international policy is relevant to an analysis of the significance of the threat posed by overutilization. Further, NMFS failed to reconcile its determination with regard to overutilization with prior conclusions made by the agency regarding overfishing of Porbeagle sharks. Therefore, NMFS' finding was and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the ESA within the meaning of the APA. 5 U.S.C. § 706(2).

73. NMFS also declined to list the DPS on the basis that existing regulatory mechanisms are inadequate. In so concluding, NMFS relied on actual harvest amounts instead of the total catch allowed by domestic and foreign regulatory mechanisms, impermissibly alluded to potential future regulations that might grant protection to porbeagles ("regulations that benefit porbeagle sharks are increasing" internationally, 75 Fed. Reg. at 39,661), ignored

the unregulated landings on the high seas, and again relied on a mischaracterization of the studies regarding current population trends. Therefore, NMFS' finding was and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the ESA within the meaning of the APA. 5 U.S.C. § 706(2).

74. NMFS also failed to assess the cumulative impacts of the threats Porbeagle sharks face. While habitat degradation, overutilization, and inadequate regulatory mechanisms independently pose a significant threat to the continued existence of the Northwest Atlantic DPS, collectively they pose a very significant and serious threat to the continued viability of the DPS. Listing is required if a species or DPS is at risk based on any one *or a combination of* the ESA listing factors, and thus NMFS was required to consider these threats together, even if the agency believed that each factor was individually insufficient to reach a positive 90-day finding. Therefore, NMFS' finding was and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the ESA within the meaning of the APA. 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

Plaintiffs request that this Court enter judgment providing the following relief:

1. Issue a Declaratory Judgment that Defendants are in violation of the law for each and every Claim as alleged herein;

2. Declare unlawful and set aside NMFS' negative 90-day finding on The HSUS' listing petition for porbeagle sharks;

3. Issue an injunction compelling NMFS to promptly conduct a full status review for Porbeagle sharks in accordance with ESA listing procedures and requirements, to be completed within a reasonable time after the Court's Order;

4. Award Plaintiffs their costs of litigation, including reasonable attorneys' fees as provided in the ESA, the Equal Access to Justice Act, and/or any other applicable law; and

5. Grant any other such relief as the Court deems just and proper.

Respectfully Submitted,

August 4, 2011

_____

Ralph Henry (D.C. Bar No. 982586)
Anna Frostic (D.C. Bar No. 977732)
The Humane Society of the United States
2100 L Street NW, Washington, D.C. 20037
Phone (202) 676-2333; Fax (202) 676-2357

*Attorneys for Plaintiff*