UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, ET AL.,<br><br>**Plaintiffs**<br><br>v.<br><br>PENNY PRITZKER, in her official capacity as Secretary of Commerce, ET AL.,<br><br>**Defendants.** | Civil Action No. 11-01414 (BJR)<br><br>**MEMORANDUM OPINION** |

## I. INTRODUCTION

Before the Court are motions for summary judgment by the parties: Plaintiff Humane Society of the United States' ("HSUS"), Plaintiff WildEarth Guardians' ("WildEarth") and Defendants Penny Pritzker, National Marine Fisheries Service ("NMFS"), and Eric C. Schwaab[1]. Upon consideration of the parties' arguments, the relevant case law, and the entire record, the Court grants Plaintiffs' Motions for Summary Judgment and denies Defendants' Motion for Summary Judgment.

## II. PROCEDURAL BACKGROUND

The instant case was filed on August 4, 2011, by Plaintiff HSUS. On September 29, 2012, this case was consolidated with two other related cases, *WildEarth Guardians v. Blank*, Civil Action No. 11-1417, and *Humane Society of the United States v. Blank*, Civil Action No. 11-1407. On June 14, 2013, this case was transferred from the Honorable Richard W. Roberts to the undersigned.

---

[1] Defendant NMFS is the agency responsible for reviewing the petitions at issue in this case. Defendant Pritzker is a party to this action in her official capacity as Secretary of Commerce. Defendant Schwaab is a party to this action in his official capacity as Assistant Administration for the National Marine Fisheries Service.

This case concerns three rulemaking petitions filed by the plaintiffs. Two petitions, filed separately by HSUS and WildEarth, requested that NMFS list the porbeagle shark as endangered or threatened pursuant to the terms of the Endangered Species Act, 16 U.S.C. §§ 1531, *et seq.* HSUS' petition sought listing of the Northwest Atlantic population of porbeagles, while WildEarth's petition sought listing of the porbeagle shark without limitation to a specific geographic population. NMFS denied the petitions at the initial 90-day stage of review, discussed in more detail below. Plaintiffs brought suit in this Court to challenge the denial of their petitions. Presently before the Court are the parties' cross-motions for summary judgment.[2]

### III. LISTING PETITION PROCEDURE

The ESA permits any person to submit a petition to list, delist, or reclassify a species as threatened or endangered.[3] The determination regarding a listing petition follows a three-stage process. First, upon receiving a petition, the Secretary shall, "[t]o the maximum extent practicable, within 90 days . . . make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). NMFS's regulation implementing the ESA defines "substantial information" as "that amount of information that would lead a reasonable person to believe that

---

[2] The Court has already ruled on HSUS's petition to list the porbeagle shark as a "Prohibited Shark Species" pursuant to the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801, *et seq.* On January 31, 2014, the Court granted Defendants' summary judgment as to these claims.

[3] The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq.*, requires that the Secretary of Commerce[3] ("the Secretary") determine whether any species is "threatened" or "endangered." 16 U.S.C. § 1533(a)(1). The Secretary of Commerce is responsible for administering the ESA with regard to most marine species, while the Secretary of the Interior is responsible for administering the ESA as it pertains to terrestrial and freshwater species. *See* 16 U.S.C. § 1532(15); 50 C.F.R. WW 17.11, 402.01(b); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 587 n.3 (1992). The Secretary has delegated this authority to NMFS, although the Secretary is ultimately responsible for listing decisions. *See C & W Fish Co., Inc. v. Fox*, 931 F.2d 1556, 1558 (D.C. Cir. 1991). A species is "endangered" if it is "in danger of extinction throughout all or [a] significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it is "likely to become an endangered species in the foreseeable future." 16 U.S.C. § 1532(20).

the measure proposed in the petition may be warranted." 40 C.F.R. § 424.14(b)(1). The Secretary's finding at this initial stage is known as a "90-day finding."

In making a 90-day finding, the Secretary must consider whether the petition:

> (i) Clearly indicates the administrative measure recommended and gives the scientific and any common name of the species involved;
> (ii) Contains detailed narrative justification for the recommended measure, describing, based on available information, past and present numbers and distribution of the species involved and any threats faced by the species;
> (iii) Provides information regarding the status of the species over all or a significant portion of its range; and
> (iv) Is accompanied by appropriate supporting documentation in the form of bibliographic references, reprints of pertinent publications, copies of reports or letters from authorities, and maps.

50 C.F.R. § 424.14(b)(2).

In the instant case, NMFS made a negative 90-day finding with regard to the petitions presented by HSUS and WildEarth. When a negative 90-day finding is made, no further action is taken by the Secretary and the negative finding is considered a final agency action.

If the Secretary makes a positive finding that the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted" at the 90-day stage, the Secretary moves to the second step of the listing process, the "12-month decision," wherein the Secretary "shall commence a review of the status of the species concerned and shall make, within 12 months of receipt of such petition" a determination of the appropriate action to be taken and publish notice in the Federal Register regarding said action. 50 C.F.R. § 424.14(b)(3).

In making a listing determination (at the 12-month decision stage), the ESA states that:

> [t]he Secretary shall . . . determine whether any species is an endangered species or a threatened species because of any of the following factors:
> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;

3

> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).  In evaluating a petition, the Secretary is to make a determination in accordance with the above factors "solely on the basis of the best scientific and commercial data available to him . . . ." 16 U.S.C. § 1533(b)(1)(A).  The Secretary must list a species if any one of the criteria is met.  *Sw. Center for Biological Diversity v. Babbitt,* 215 F.3d 58, 60 (D.C. Cir. 2000).  If the Secretary determines that the petitioned action is warranted due to one of the criteria being met, the Secretary must publish a proposed regulation in the Federal Register to implement the action.  50 C.F.R. § 424.14(b)(3).

Finally, at the third stage in the listing process, the Secretary promulgates the final listing determination.  16 U.S.C. § 1533(b)(5).

## IV. STANDARD OF REVIEW

This Court reviews NMFS's final actions under the "arbitrary and capricious" standard of review.  Under this standard, as set out by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500, *et seq.*, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2).  To meet the requirements of the APA, an agency must "examine the relevant data and articulate a satisfactory explanation for its action."  *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1810 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  An agency acts arbitrarily and capriciously where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Arent v. Shalala*, 70 F.3d 610, 616 (D.C. Cir. 1995) (quoting *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43). This Court's review of the action "must be searching and careful, but the ultimate review is a narrow one." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotations and citation omitted).

The parties have filed cross-motions for summary judgment. "Summary judgment is the appropriate mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008) (citing *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)). The court's inquiry "is confined to reviewing the administrative record." *Blue Ocean*, 585 F. Supp. 2d at 41 (citing *North Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007)).

## V. FACTUAL BACKGROUND

The porbeagle shark ("porbeagle") (*Lamna nasus*) is a shark in the family *Lamnidae*, known as mackerel sharks. AR 000010. Porbeagles inhabit the North and South Atlantic Ocean, the southern Indian Ocean, the Southern Pacific Ocean, and the Antarctic Ocean. AR 000011. Porbeagles are long-lived sharks, having a lifespan of twenty-five to forty-six years. Females reach sexual maturity at thirteen years and give birth to two to six offspring after a gestation of between eight and nine months. AR 000012. The parties agree that porbeagles are considered to have a low rate of reproduction because of the late onset of sexual maturity. AR 000012, AR000033. Porbeagles have been heavily fished and used for human consumption in North America and the Mediterranean. AR 003338. Since 1961, the Northwest Atlantic population of

porbeagles has drastically declined by 90%, to approximately 11,000 to 14,000 individuals. AR 003337, 003839.

According to Plaintiff HSUS and to assessments conducted by the International Council for the Exploration of the Seas (ICES) and the International Commission for the Conservation of Atlantic Tunas (ICCAT), porbeagles in the Northeast and Northwest Atlantic Ocean constitute distinct populations with very limited transatlantic migration. AR 000011, 000695. Plaintiff HSUS also presented evidence that there is no evidence of genetic exchange between the North Atlantic and southern hemisphere populations. AR 000011. In its negative finding regarding Plaintiffs' petition, Defendant NMFS stated that there was "conflicting scientific evidence regarding whether DPSs [Distinct Population Segments] of porbeagle sharks exist . . . [g]iven the conflicting evidence from the tagging and genetic data, without a more thorough analysis it is unclear as to whether porbeagle shark DPSs exist." AR 000695. However, in its negative finding NMFS did consider whether there was substantial evidence supporting the listing of porbeagles as a whole or as a DPS. *Id.*

Defendant NMFS determined that the best source of data concerning the present status of the porbeagle shark was the aforementioned ICES/ICCAT joint stock assessment, conducted in 2009. AR 003830-3886; AR 000695. At an internal NMFS meeting to discuss the petitions, NMFS summarized the assessment and, in NMFS' words, found "that the stock assessment indicated that the stocks are stable or increasing and that overfishing is not occurring." AR 000082. NMFS used similar language in denying the petition, stating that "stocks are depleted . . . [but] stocks are stable or increasing in size (ICES/ICCAT, 2009)." AR 000697.

The ICES/ICCAT assessment grouped the porbeagle population into four population groups: Northeast Atlantic, Northwest Atlantic, Southwest Atlantic, and Southeast Atlantic.

With respect to the Northwest Atlantic, the assessment concluded that, in 2009, the porbeagle population was from 95-103% of its population in 2001, with the population of mature female porbeagles anywhere from 83-103% of their 2001 level[4]. AR 003839. In other words, the population in general might have declined marginally, remained stable, or grown marginally, while the population of mature females might have declined by 17% or increased by 3%. The assessment discussed Canadian reports indicating that "biomass is depleted to well below $B_{MSY}$[5], although recent fishing mortality is also below $F_{MSY}$[6] . . . [d]espite this, stock rebuilding is projected to take decades due to the low productivity of the species." AR 003842. The assessment concluded that "[t]he Commission should adopt management measures that support the recovery objectives of the Canadian Management Plan. High-seas fisheries should not target porbeagle . . . [a]reas known to have high abundance of important life history stages . . . should be subject to fishing restrictions." AR 003843. In its denial of Plaintiffs' petitions NMFS found that the data indicated that "biomass is currently increasing, and overfishing is no longer occurring." AR 000697.

With respect to the Northeast Atlantic, the assessment concluded that "current biomass is below $B_{MSY}$ and that recent fishing mortality is near or possibly above $F_{MSY}$." AR 003842. Further, ICES "consider the stock to be depleted . . . ." *Id.* The assessment recommended that "[s]ustained reductions in fishing mortality would be required if there is to be any stock recovery" and that therefore "the Commission should consider adopting TACs which provide a high probability of allowing stock rebuilding. Additionally, the Commission should consider

---

[4] This population level corresponded to approximately 12% to 16% of the 1961 population level, or 11,000 to 14,000 individuals. AR 003839.
[5] Biomass Maximum Sustainable Yield, that is, the biomass (total body-weight) of fish population that will permit the fishing maximum sustainable yield (catch or $F_{MSY}$) to be taken indefinitely. AR 003837.
[6] Fishing Maximum Sustainable Yield, that is, the maximum amount of fishing mortality that will permit a population to reach $B_{MSY}$. When fishing mortality is above $F_{MSY}$, then more than a sustainable portion of the stock is being remove per year and the population is moving away from a sustainable biomass ($B_{MSY}$). This is also referred to as "overfishing." Defs.' Mot. at 5.

7

restricting fishing activities in areas known to have a high abundance of important life-history stages . . . [n]ations . . . . should consider adopting further management measures to reduce fishing mortality." *Id.* NMFS stated in its denial of Plaintiffs' petitions that "current management efforts are likely to result in the stock remaining fairly stable." AR 000696.

With respect to the Southwest Atlantic, the assessment noted that data was limited, but that the available data suggested "a potential decline in porbeagle abundance in the SW Atlantic to levels below [maximum sustainable yield]." AR 003841. The assessment further noted that "depletion levels [are] below [maximum sustainable yield] and fishing mortality rates above those producing [maximum sustainable yield]. But catch and other data are generally too limited to allow definition of sustainable harvest levels. Catch reconstruction indicates that reported landings grossly under-estimate actual landings." *Id.* The assessment recommended that the Commission "consider adopting precautionary measures, including restricting fisheries affecting the stock(s) . . . ." In its denial of Plaintiffs' petitions NMGS acknowledged that the stock was depleted and fishing mortality rates were above MSY, but emphasized that "data are generally too limited to allow definition of sustainable harvest levels." AR 000696.

With respect to the Southeast Atlantic, the assessment noted that data was too limited and that while "catch rate patterns suggest stability since the early 1990s" this trend could not be viewed in context due to lack of data and was "not informative on current levels relative to $_{BMSY}$." AR 003841. In its denial NMFS repeated that data was too limited, but emphasized that "available catch rate patterns suggest that this stock has stabilized . . . ." AR 000696.

With respect to the porbeagle population in general, NMFS concluded that "available information indicates that porbeagle shark population trends are stable or increasing globally, and that protections for the species are increasing in these areas as well; therefore, the petitions

8

do not present substantial information indicating that the petition actions . . . may be warranted at this time." AR 000698. Based on its conclusion, NMFS denied Plaintiffs' petitions at the 90-day stage.[7]

## VI. ANALYSIS

Plaintiffs' main argument concerns the lower burden of proof required by the Secretary to make a positive 90-day finding versus the level of evidence required to make a listing determination at the 12-month stage. Plaintiffs argue that NMFS improperly applied the 12-month determination standard to their petitions at the 90-day finding stage. Plaintiffs point to the language of 16 U.S.C. § 1533(b)(3)(A) and available case law in arguing that "[t]he only question before [NMFS] when it conducts a 90-day review is whether the petitioned action *may be warranted*, not whether it *is warranted*." *Ctr. for Biological Diversity v. Kempthorne*, 2008 WL 659822, at *9 (D. Ariz. Mar. 6, 2008) (citing 16 U.S.C. § 1533(b)(3)(A). The court in *Kempthorne* determined that the application of the 12-month determination's evidentiary standard at the 90-day review stage was arbitrary and capricious. *Id* (holding that "the application of an evidentiary standard requiring conclusive evidence in the context of a 90-day review is arbitrary and capricious."). Plaintiffs also argue that NMFS itself has acknowledged the lower evidentiary requirement for a 90-day finding, as NMFS has described the level of evidence required to "lead a reasonable person to believe that the measure proposed in the

---

[7] Plaintiff HSUS also presented evidence in its petition that the habitat of the porbeagle (particularly the Northwest Atlantic DPS) is under threat from coastal pollution, including mercury runoff, warming ocean waters due to climate change, and ocean acidification. AR 000018-000020. Plaintiffs also presented evidence that current international fishing levels may exceed maximum sustainable yield. AR 000023-000026. Plaintiff WildEarth also pointed to evidence from a 2004 study of the Committee on the Status of Endangered Wildlife in Canada (COSEWIC) stressing the low yearly reproductive rate of the porbeagle, approximately 0.05%. AR 003071. In its denial of the petitions NMFS responded by again emphasizing its position that "stocks were generally stable or increasing in biomass." AR 000698. NMFS reasoned that because stocks were stable or increasing, the negative effects from habitat degradation and fishing were not significant. *Id.* Because the Court's determination in this case is based upon the standard of review applied by Defendant NMFS at the 90-day stage, the Court does not delve further into these evidentiary issues.

petition may be warranted." For instance, NMFS has stated that in evaluating petitions at the 90-day stage, it does not "subject the petition to critical review." 71 Fed. Reg. 66,298 (Nov. 14, 2006). NMFS has also acknowledged that past judicial decision have established that "a petition need not establish a 'strong likelihood' or a 'high probability' that a species is either threatened or endangered to support a positive 90-day finding." 79 Fed. Reg. 4,877 (Jan. 30., 2014).

Plaintiffs cite a number of cases in support of their position. *See Moden v. FWS*, 281 F. Supp. 2d 1193, 1204 (D. Or. 2003) ("the standard for evaluating whether substantial information has been presented by an 'interested person' is not overly-burdensome, does not require conclusive information, and uses the 'reasonable person' to determine whether . . . action may be warranted."); *CBD v. Kempthorne*, 2007 WL 163244, at *4-*7 (N.D. Cal. 2007) (finding that the "may be warranted standard . . . seems to require that in case of such contradictory evidence, the Service must defer to information that supports [the] petition's position . . . the Service should make the [90-day] finding and then proceed to the more-searching next step in the ESA process." (internal quotations omitted); *W. Watersheds Project v. Norton*, 2007 WL 2827375, at *5 (reversing denial of petition and finding that "[w]hat is required at this stage . . . is a review of the Petition for determination of whether it presents substantial information indicating to a reasonable person that the petitioned action may be warranted . . . [t]his standard . . . does not require conclusive evidence.") (internal citations omitted); *CBD v. Morgenweck*, 351 F. Supp. 2d 1137, 1140 (D. Colo. 2004) (setting aside negative 90-day finding where agency improperly required a high level of evidence to warrant further consideration); *Colorado River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170, 176 (D.D.C. 2006) (Friedman, J.) (holding that the 90-day finding step is intended to be a "less searching review"). Based on this case law and the

evidence presented in their petitions, Plaintiffs argue that NMFS acted arbitrarily and capriciously in returning a negative 90-day finding.

### A.  Distinct Population Segments

First, Plaintiffs' argue that NMFS erred in requiring conclusive evidence regarding the existence of "Distinct Population Segments" ("DPS") of porbeagle sharks.  In particular, Plaintiffs point to NMFS's statement that  "conflicting scientific evidence regarding whether DPSs [Distinct Population Segments] of porbeagle sharks exist . . . [g]iven the conflicting evidence from the tagging and genetic data, without a more thorough analysis it is unclear as to whether porbeagle shark DPSs exist."  AR 000695.  Plaintiffs argue that NMFS wrongfully concluded that there was no "substantial information" regarding the existence of a Northwest Atlantic DPS, and that NMFS required a higher degree of evidence than "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 40 C.F.R. § 424.14(b)(1).  The Court agrees.  NMFS acknowledges in its denial of Plaintiffs petition that there is "conflicting scientific evidence" regarding the existence of porbeagle DPSs, and suggested the need for a "more thorough analysis."  NMFS's own conclusion regarding the need for more thorough analysis suggests that a reasonable person might conclude that "a review of the status of the species concerned" was warranted.  As such, NMFS acted arbitrarily and capriciously in applying an inappropriately-stringent evidentiary requirement at the 90-day stage.  50 C.F.R. § 424.14(b)(3).

The parties spend a significant portion of their briefs arguing whether NMFS' determination regarding the existence of porbeagle DPSs was correct.  While NMFS' erred in applying an inappropriate evidentiary standard to the DPS determination, NMFS did, in fact, consider in its denial of the petitions whether there was substantial evidence supporting the

11

listing of porbeagles as a whole or as a DPS, stating that "in order to be thorough . . . we considered whether the petitioners presented substantial evidence indicating that the petitioned action for the full species or for the DPS as proposed . . . may be warranted."  AR 000695. Accordingly, while NMFS erred in its conclusion that, at the 90-day finding stage, "conflicting evidence" permitted it to determine that Plaintiffs had failed to prevent "substantial evidence" regarding the existence of porbeagle DPSs, NMFS acted properly when it went on to evaluate Plaintiffs' petitions with regard to both the whole population of porbeagles or as to the DPSs proposed by Plaintiffs.

### B.  ICES/ICCAT Assessment Supports Plaintiffs' Petitions

The parties differ sharply in their interpretation of the data provided by the 2009 ICES/ICCAT joint stock assessment, which NMFS identified as the best source of data concerning the porbeagle.  AR 000695.  Plaintiffs argue that their petitions contained "substantial evidence" drawn from the ICES/ICCAT assessment to indicate that listing might be warranted, thus requiring that NMFS make a positive 90-day finding.  Instead, Plaintiffs argue, NMFS improperly applied a higher evidentiary standard at the 90-day stage, discounting the evidence relied on by Plaintiffs while cherry-picking the 2009 assessment to provide a more-optimistic view of the evidence than was warranted.

In assessing the Northwest Atlantic porbeagle population, the ICES/ICCAT report concluded that, in 2009, the porbeagle population was between 95 percent and 101 percent of its population in 2001.  AR 00015.  The assessment concluded that the population of mature female porbeagles, which Plaintiffs contend best reflects the effective population size, was between 83 and 103 percent of 2001 values, and that recovery of the stock could take "decades."  AR 000015, 003590, 003842.  (FAO guidance for evaluating aquatic species for listing under

CITES). The assessment also stated that "[r]ecent biomass appears to be increasing." AR 003842. NMFS, in denying the petitions, interpreted this data as establishing that "stocks are depleted . . . [but] stocks are stable or increasing in size (ICES/ICCAT, 2009)." AR 000697. However, Plaintiff WildEarth correctly points out that under both these measurements "the potential of a decrease is greater" than the potential for growth. Pl. WildEarth's Mot. at 25. In other words, the already-low population of porbeagles in 2001 may have declined marginally, remained stable, or grown marginally, while the population of mature females may have declined by up to seventeen percent, or grown by three percent. Accordingly, the likelihood of decline in the porbeagle population in the Northwest Atlantic was higher than the likelihood of growth or stability. Supporting this view of the data is ICES/ICCAT's recommendation of the adoption of management measures to support recovery of the porbeagle population, including fishing restrictions in certain areas. AR 003843.

NMFS did not acknowledge the possibility that the porbeagle population has declined and appears to have considered only the most optimistic view of the assessment (i.e., that population was on the rise), stating that "stocks are depleted . . . [but] stocks are stable or increasing in size (ICES/ICCAT, 2009)." AR 000697. NMFS focused on, and repeated, the statement in the assessment that "[r]ecent biomass appears to be increasing." While such a conclusion certainly reflects a permissible view of the evidence were Plaintiffs required to establish conclusive evidence of porbeagle decline, Plaintiffs need only establish "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." Data in the ICES/ICCAT assessment indicates that it is more likely than not that the already-low population of porbeagles, particularly mature females, has declined. NMFS failed to articulate why this evidence was insufficient to trigger a positive 90-day finding

requiring further study.  While the Court is required to defer to the agency's technical expertise in areas of scientific specialization, the Court is not required to ignore simple probability.  *See Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc).  NMFS acted arbitrarily and capriciously in applying the wrong evidentiary standard at the 90-day stage and ignoring evidence that the porbeagle population in the Northwest Atlantic faces a strong likelihood of decline.

Similarly, with respect to the Northeast Atlantic population of porbeagles, ICES/ICCAT concluded that "current biomass is below [maximum sustainable yield] and that recent fishing mortality is near or possibly above [maximum fishing mortality]."  AR 003842.  The assessment recommended that "[s]ustained reductions in fishing mortality would be required if there is to be any stock recovery" and that therefore "the Commission should consider adopting TACs which provide a high probability of allowing stock rebuilding . . . [and] should consider restricting fishing activities . . [n]ations . . . . should consider adopting further management measures to reduce fishing mortality."  *Id.*  Plaintiff WildEarth argues that this evidence is sufficient at the 90-day stage to indicate that the Northeast Atlantic stock of porbeagles is threatened.  NMFS appears to have ignored this evidence in making its 90-day finding, stating that "current management efforts are likely to result in the stock remaining fairly stable."  AR 000696.  This conclusion was arbitrary and capricious given the lower standard of evidence required at the 90-day finding stage.

With respect to the Southwest Atlantic population of porbeagles, the assessment noted that data was limited, but that available data was available "suggesting a potential decline in porbeagle abundance in the SW Atlantic to levels below MSY."  AR 003841.  Models available to ICES/ICCAT indicated "depletion levels below MSY and fishing mortality rates above those

producing MSY. But catch and other data are generally too limited to allow definition of sustainable harvest levels. Catch reconstruction indicates that reported landings grossly under-estimate actual landings." *Id.* The assessment recommended that the Commission "consider adopting precautionary measures, including restricting fisheries affecting the stock(s) . . . ." In its denial of Plaintiffs' petitions NMFS acknowledged that the stock was depleted and fishing mortality rates were above MSY, but emphasized that "data are generally too limited to allow definition of sustainable harvest levels." AR 000696. However, the Court notes that, to the extent the assessment discussed the uncertainty of defining sustainable harvest levels, it did so because of the under-estimation of the actual number of landings of porbeagles; this suggests that the population is indeed threatened. The Court agrees with Plaintiff WildEarth that, at the 90-day stage, some level of uncertainty should not negate the general finding of the assessment that the Southwest Atlantic population of porbeagles was in decline.[8]

### C. Defendants' Counterarguments

Defendants' arguments in response do not counter Plaintiffs' basic premise that the evidentiary requirement for a positive 90-day finding is relatively low; indeed, Defendants acknowledge that the "'substantial information' standard is not onerous." Defs.' Mot. at 17. Rather, Defendants argue that there "was no uncertainty associated with NMFS's consideration of whether the species is at risk of extinction . . . the most recent stock assessment . . . indicates increases in biomass in some stocks and stability in others." *Id*. Defendants suggest that the

---

[8] With respect to the Southeast Atlantic population of porbeagles, the assessment noted that data was too limited and that while "catch rate patterns suggest stability since the early 1990s" this trend could not be viewed in context due to lack of data and was "not informative on current levels relative to $_{BMSY.}$" AR 003841. Given the suggestion of stability and lack of context for the data NMFS acted appropriately in finding that Plaintiff WildEarth had not provided "substantial evidence" that the Southeast Atlantic population of porbeagles is threatened.

substantial information standard "cannot be construed to require NMFS to defer to . . . outdated references and ignore available information . . . ." *Id.*

Defendants are correct in noting that this Court must follow the deferential APA standard, in which the agency must merely "examine the relevant data and articulate a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1810 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). However, in the instant case, the Court finds that NMFS failed to apply the correct evidentiary standard required by its own regulations at the 90-day finding stage. In considering Plaintiffs' petitions NMFS appears to have required "conclusive evidence" regarding threats to the porbeagle population. In their petitions Plaintiffs relied on a number of sources of data, including the ICES/ICCAT assessment which Defendants identified as "the best source of data about the current status of porbeagle sharks . . . ." Defs.' Mot. at 4. AR 000035, 000038. NMFS itself relied on the ICES/ICCAT assessment as the best available source of data regarding the status of the porbeagle. The ICES/ICCAT assessment presents substantial scientific information indicating that the petitioned action, that is, the listing of the porbeagle shark as endangered or threatened, may be warranted. As previously discussed by the Court, the assessment provides evidence that the porbeagle population (or distinct population segments thereof) may be declining from an already-critically low baseline. The assessment also indicates that additional measures are necessary to rebuild the porbeagle population. This evidence is a far cry from the "statements in petitions that constitute unscientific data or conclusions, information [the agency] knows to be obsolete, or unsupported conclusions of petitioners" that have been rejected by other courts as meeting the 90-day finding standard. *Ctr. for Biological Diversity v. Morgenwreck*, 351 F. Supp. 2d 1137, 1140-42 (D. Colo. 2004). The Court finds that the

evidence provided by Plaintiffs more than meets "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 40 C.F.R. § 424.14(b)(1). Defendants' conclusion otherwise was the result of the application of an inappropriately high standard of evidence and was, therefore, arbitrary and capricious

Defendants seek to rely on the Court's previous grant of summary judgment dismissing Plaintiff HSUS's Magnuson-Stevens Act ("MSA") claims. In that order the Court found that NMFS' denial of Plaintiffs' petitions to list the porbealge as a prohibited species pursuant to the MSA was supported by substantial evidence and was not, therefore, arbitrary and capricious. *See* Order [46] at 14-15. In making their MSA determination, Defendant NMFS relied on the same ICES/ICCAT assessment at issue in the instant motions. Defendants thus argue that the Court should once again grant summary judgment in deference to NMFS' determination.

The Court reaches a different outcome in the instant motions because of the differing statutes and implementing regulations at issue. The Magnuson-Stevens Act, concerned with fishery management and conservation, sets a higher evidentiary bar for Plaintiffs to meet than the Endangered Species Act. 50 C.F.R. § 635.34(c), which implements the MSA, states that NMFS "may" list a species if Plaintiffs provide evidence meeting various factors. Given the expansive language of the regulation and the high evidentiary bar that it sets, the Court found that NMFS' refusal to list the porbeagle as a prohibited species was not arbitrary and capricious. In the instant analysis, however, Plaintiffs must meet a far lower standard of evidence at the ESA's 90-day finding stage. A 90-day determination under the Endangered Species Act constitutes a "threshold determination," *Cutthroat Trout*, 448 F. Supp. 2d at 176, and Plaintiffs need only provide "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 40 C.F.R. § 424.14(b)(1). While the Court

must give APA deference to NMFS's determination regarding whether Plaintiffs have met this low evidentiary bar, the Court nevertheless has found that Defendants acted arbitrarily and capriciously in applying an incorrectly stringent evidentiary standard at the 90-day finding stage. Accordingly, the Court's previous ruling does not support NMFS's negative 90-day finding.[9]

### D. Appropriate Remedy

Plaintiffs request that the Court vacate NMFS's 90-day finding and order NMFS to complete a status review and 12-month decision as to the listing of the porbeagle shark. In the alternative, Plaintiffs' request that the Court vacate the 90-day finding and remand to the agency for a determination correctly applying the standards set out in the ESA and NMFS's regulations. Defendants contend that this Court should limit its holding to setting aside the 90-day finding. 5 U.S.C. § 706. The remedy suggested by Defendants is the correct one. Generally, "when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *North Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008) (quoting *PPG Indus. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995)).

Because the Court has found that Defendant NMFS acted in an arbitrary and capricious manner in applying an incorrect evidentiary standard at the 90-day finding stage, the Court

---

[9] Defendants also contest WildEarth's standing to petition for the protection of porbeagle sharks outside of the Northwest Atlantic population. While Defendants concluded that no porbeagle shark DPSs exist, they argue that WildEarth has standing to petition only with respect to that DPS of porbeagles its members have encountered, i.e., the Northwest Atlantic population. Defendants seem to not recognize the inconsistency in their positions. Because Defendants determined at the 90-day stage that there was insufficient evidence to conclude that DPSs of porbeagles existed, Plaintiff WildEarth, who undoubtedly has standing as to porbeagles in the Northwest Atlantic, has standing to porbeagles in general. Were Defendants to determine that there were indeed separate DPSs, Defendants argument might well be correct. However, the Court need not address this theoretical question. "Although standing is usually a threshold inquiry, both the Supreme Court and this Circuit have long recognized the propriety of avoiding difficult, constitutionally-based justiciability issues when a case is more simply resolved on another basis." Railway Labor Executives' Ass'n v. United States, 987 F.2d 806, 811 (D.C. Cir. 1993). Because Defendants' standing argument is foreclosed by their own evidentiary determination, the Court declines to wade deeper into the standing issue at this time.

vacates NMFS's decision and remands to the agency to reconsider Plaintiffs' petitions in light of the Court's ruling.

## VII. CONCLUSION

The Court GRANTS IN PART Plaintiffs' Motions for Summary Judgment and DENIES Defendants' Motion for Summary Judgment. An order consistent with this opinion will issue separately.

*/s/ Barbara J. Rothstein*

_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE